## UNITED STATES of America,

v.

## Charles A. URREGO, also known as "Jonathan Rives", also known as "Charlie Arms", Defendant.

## CR 92–331 (ADS).

United States District Court, E.D. New York.

May 31, 1994.

Zachary W. Carter, U.S. Atty., E.D.N.Y., Garden City, NY, by Asst. U.S. Atty., Mark O. Wasserman, for government.

Charles A. Urrego, pro se.

Gerald J. DiChiara, New York City by Gerald J. DiChiara, John J. DiChiara, for defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The defendant Charles A. Urrego ("Urrego") is charged in count three of the superseding indictment with the use and carrying of a firearm. Specifically, the indictment charges that "[o]n or about March 11, 1992, within the Eastern District of New York, the defendants CHARLES A. URREGO ... and ANGELO VOZZELLA did knowingly and wilfully use and carry a firearm during and in relation to a crime of violence, to wit: the crimes charged in Counts One and Two" (Superseding Indictment, at Count Three). The second superseding indictment essentially uses the same language, however it omits any reference to Angelo Vozzella (Second Superseding Indictment, at Count Three).

The statute governing this count is 18 U.S.C. § 924(c)(1) which states, in relevant part, that:

"Whoever, during and in relation to any crime of violence ... for which he may be

prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years...." (18 U.S.C. § 924[c][1]).

In addition to alleging a violation of this statute, the third count also asserts criminal liability based on aiding and abetting in the commission of the section 924(c) crime (*See* 18 U.S.C. § 2).

The evidence in the case demonstrates, and it is undisputed by the Government and the Defendant, that the crime charged in count three of the superseding indictment is the use and carrying of a firearm by Angelo Vozzella on March 11, 1992. Special Agent Thomas C. Nicpon of the Federal Bureau of Investigation testified that on March 11, 1992 the FBI was executing a search warrant at Arms Painting, a business owned by the defendant Urrego, when Angelo Vozzella arrived. According to Special Agent Nicpon, a search warrant was thereafter executed on the person of Vozzella and a black leather "fanny pack" was found and in the fanny pack "we found several items including a handgun, paper records that contained names, numbers, and dates on them, also an American Express Gold Card in the name of Angelo Vozzella. And we found approximately $1,670 in cash" (Transcript, at p. 734). It is the handgun found in the possession of Vozzella which is the subject of count three.

It is clear and conceded by the Government that the indictment charges Vozzella with the use and carrying of the firearm on March 11, 1992 and the criminal liability of the defendant Urrego must be based on another theory. Since the indictment charges the defendant with violating 18 U.S.C. § 2, the aiding and abetting statute, it appears from the face of the indictment that the defendant Urrego is charged with aiding and abetting Vozzella's use and carrying of the firearm on March 11, 1992. The aiding and abetting statute states "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal" (18 U.S.C. § 2[a]). According to the Second Circuit:

"[t]o secure a conviction on a theory of aiding and abetting in violation of subsection (a), the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required the defendant to act, with the specific purpose of bringing about the underlying crime" (*United States v. Concepcion,* 983 F.2d 369, 383 [2d Cir.1992], *cert. denied,* —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 [1993]).

Since it is undisputed that the defendant Urrego was arrested on March 9, 1992, two days prior to the search and arrest of Vozzella on March 11, 1992, the Court has already determined, as a matter of law, that a reasonable juror could not find that the defendant Urrego was guilty of the crime of aiding and abetting the commission of the section 924(c) crime by Vozzella. In addition to the defendant Urrego's incarceration two days prior to the use and carrying of the firearm by Vozzella, there was no evidence presented by the Government of any aiding or abetting. Accordingly, the Court dismissed that portion of the indictment.

The remaining contention of the Government is that the jury should be charged that the defendant Urrego may be found guilty of the crime charged in count three of the superseding indictment based on a *Pinkerton* liability theory. In the case of *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946), the Supreme Court stated that all members of a conspiracy are responsible

"when the substantive offense is committed by one of the conspirators in furtherance of the unlawful project ... The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act was done in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of

one partner in crime is attributable to all" (*Pinkerton, supra,* 328 U.S. at p. 647, 66 S.Ct. at p. 1184).

In the *Pinkerton* case the defendants were two brothers, Walter and Daniel Pinkerton, who were indicted for violations of the Internal Revenue Code. The indictment contained ten substantive counts and one conspiracy count. Walter was found guilty of nine substantive counts and the conspiracy. Daniel was found guilty of six substantive counts and the conspiracy. No evidence was presented to demonstrate that Daniel participated directly in the commission of the substantive counts charged in the indictment, "although there was evidence that these substantive offenses were in fact committed by Walter in furtherance of the unlawful agreement or conspiracy existing between the brothers" (*Pinkerton, supra,* 328 U.S. at p. 645, 66 S.Ct. at p. 1183). The Supreme Court affirmed the conviction of the Daniel on the substantive charges even though there was no evidence that he participated directly in the commission of the substantive crimes. This was the birth of *Pinkerton* liability.

According to the Second Circuit, the doctrine of *Pinkerton* liability "permits a jury to find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of the unlawful conspiracy, and that the defendant was a member of that conspiracy. *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.) (Friendly, J.), *cert. denied,* 423 U.S. 842 [96 S.Ct. 75, 46 L.Ed.2d 62] ... (1975)." (*United States v. Harwood,* 998 F.2d 91, 100 [2d Cir.], *cert. denied,* —— U.S. ——, 114 S.Ct. 456, 126 L.Ed.2d 388 [1993]).

In a case discussing the scope of *Pinkerton* liability, the Sixth Circuit stated:

"The *Pinkerton* doctrine 'permits the conviction of a coconspirator for the substantive offense of other coconspirators committed during and in furtherance of the conspiracy.' ... It exists to punish conspirators for crimes committed by a coconspirator that are not the object of the conspiracy itself but are foreseeable and in furtherance of the conspiracy" (*United States v. Christian,* 942 F.2d 363, 367 [6th Cir.1991], *cert. denied,* —— U.S. ——, 112 S.Ct. 905, 116 L.Ed.2d 806 [1992]).

It is the position of the Government that this liability should be extended to the present case in which the defendant Urrego is charged with two separate conspiracies, counts one and two, as well as the substantive gun charge contained in count three. The Eighth Circuit addressed a case in which the court extended *Pinkerton* liability to a firearm charge under section 924(c) (*See United States v. Golter,* 880 F.2d 91, 93–94 [8th Cir.1989]). In *Golter,* the firearm charge stems from the arrest of one Kevin Morris, a cocaine dealer. Morris had purchased cocaine from the defendant Golter and was arrested when Morris completed a cocaine transaction with a Government informant. Morris thereafter implicated Golter in the cocaine conspiracy and informed the police that Golter had provided the cocaine to him. During a search of Morris' car, police officers discovered a .25 caliber automatic pistol in the glove compartment. It Morris' firearm which the Government attributes to the defendant Golter via a *Pinkerton* theory (*See Golter, supra,* 880 F.2d at p. 92).

The Court found that the following constituted reasonable evidence to support the conclusion that the firearm was carried by Morris in furtherance of the drug conspiracy and should be attributed to the defendant Golter:

1) The drug conspiracy clearly existed.

2) The .25 caliber automatic gun and clip were in the possession of the coconspirator Morris at the time he was distributing cocaine obtained by the defendant.

3) The defendant was aware that the coconspirator Morris was afraid of one Terry Reynolds turning Morris in to the authorities and it was a reasonable inference that Morris carried a weapon for protection.

4) The defendant Golter was an experienced drug dealer and the court noted the nexus between drugs and firearms.

It was based on these findings that the Eighth Circuit determined that it was proper to submit the firearm count to the jury based on a *Pinkerton* theory (*See Golter, supra,*

880 F.2d at p. 94; *see also United States v. Comeaux,* 955 F.2d 586, 591 [8th Cir.], *cert. denied,* —— U.S. ——, 113 S.Ct. 135, 121 L.Ed.2d 89 [1992] [citing *Golter* case for *Pinkerton* doctrine] ).

In the present case, when construing the evidence in favor of the Government, as this court must do on a Rule 29 motion, the Court finds as follows:

1) The testimony of Special Agent Nicpon shows that the handgun in the possession of Vozzella was in the same fanny pack as the alleged extortion records, the Urrego American Express Card, and cash, presumably from extortion vig payments.

2) There was testimony that the defendant Urrego knew that Vozzella carried a firearm.

3) The Court already determined that there is a close proximity between guns and extortion (*See United States v. Gilley,* 836 F.2d 1206 [9th Cir.1988] ).

However, although the Court finds that there was sufficient evidence of a conspiracy between the defendant Urrego and Vozzella, from in or about January 1988 until in or about March 1992, the period of time charged in counts one and two of the superseding indictment, the following questions remain: (1) When did the conspiracy end in March 1992? (2) When did the defendant's participation in the conspiracy end?

The defendant Urrego contends that the conspiracy ended on March 9, 1992, the date on which the defendant was arrested. The Government takes the position that the arrest of Urrego did not end the conspiracy and therefore the actions of the coconspirator Vozzella on March 11, 1992 may be attributed to the defendant Urrego via a *Pinkerton* theory.

Although a conspiracy does not necessarily terminate with the arrest of one or more of the members of the conspiracy, it is the contention of the defendant that Urrego's participation in the conspiracy ended with his arrest on March 9, 1992 and that he should not be charged with any substantive actions of Vozzella after that date (*See United States v. Goff,* 847 F.2d 149, 170 [5th Cir.], *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 [1988] ).

In *Goff,* the Fifth Circuit stated that "[i]t is well settled that a *person's participation* in a conspiracy ends when the person is arrested for his role in the conspiracy" (*Goff, supra,* 847 F.2d at p. 170 [quoting *United States v. Dunn,* 775 F.2d 604, 607 (5th Cir.1985) ] ). The *Dunn* decision, which was cited as authority in *Goff* for the proposition that an individual's participation in a conspiracy ends when that individual is arrested, states as follows:

"even if Dunn continued participating in the overall Merida conspiracy, as a matter of law his arrest on November 8, 1980 ended his involvement with that criminal operation. Any involvement with Merida's confederates after November 8, 1980 required a new agreement. That new agreement occasioned the birth of a new and separate conspiracy for which Dunn is accountable" (*Dunn, supra,* 775 F.2d at p. 607).

These cases support the defendant's contention that the defendant's possible participation in the actions by Vozzella in carrying the gun terminated on March 9, 1992 with the arrest of Urrego.

In fact, in a situation in which a defendant challenged the admissibility of certain coconspirator statements on the ground that the conspiracy ended with the arrest of one of the coconspirators, the Second Circuit stated "[a]lthough his participation *may* have ended at that point, the conspiracy among the others, especially including the appellants, continued" and therefore the coconspirator statements were admissible against the appellants (*United States v. Katz,* 601 F.2d 66, 68 [2d Cir.1979] [emphasis added] ). It appears from the *Katz* decision that a defendant's participation may or may not end with arrest and incarceration.

Two earlier decisions, not cited in the *Katz* decision, appear to elaborate on this concept. In *United States v. Agueci,* 310 F.2d 817 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963), the Second Circuit stated "[t]he law is clear ... that while arrest or incarceration *may* constitute a withdrawal from a conspiracy, it does not follow that in every instance it *must* " (*Ague-*

*ci, supra,* 310 F.2d at p. 839). Further, in *United States v. Borelli,* 336 F.2d 376 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), the Second Circuit stated that "[n]either authority nor reason would suggest that imprisonment necessarily shows a withdrawal" (*Borelli, supra,* 336 F.2d at p. 389 [citing *Agueci* ]). In both of these cases, the Second Circuit examined the factual setting to determine whether the imprisonment ended the conspiracy.

In *Agueci,* for example, the Court was faced with a situation in which "Valachi had in fact designated Porcelli, Guippone, and others to look after his interest in the conspiracy after his incarceration. Since Valachi was to get a share in the profits made on sales by those co-conspirators, there is little question but that he continued to have a stake in the success of the venture" (*Agueci, supra,* 310 F.2d at p. 839). The Court went on to state as follows:

> "Certainly the jury could have disbelieved this evidence and found that Valachi had in fact withdrawn from the conspiracy; if he had, then subsequent acts and declarations of coconspirators could not be used against him and he could not be responsible for the acts committed by this colleague[ ] in furtherance of the conspiracy. *Pinkerton v. United States, supra* " (*Agueci, supra,* 310 F.2d at p. 839).

In *Borelli,* the Second Circuit found that there was evidence presented by the Government to show the "continued participation" of the defendant Rosario after his incarceration. Although it was found to be "less strong than as to Valachi's in *Agueci,* it was strong enough for the jury to find that, far from withdrawing, he continued to be a significant member of the conspiracy" (*Borelli, supra,* 336 F.2d at p. 376).

In the present case there was no evidence presented by the Government to show the continued involvement of the defendant Charles Urrego in the conspiracy after his arrest. Although it is noted that there was still money "out on the street" due to the loans made by the defendant Urrego, there was no evidence presented to demonstrate that the defendant Urrego was involved in any way to collect or attempt to collect this money or to use extortionate means to collect or attempt to collect after March 9, 1992. In sum, no evidence was presented of any allegedly extortionate extensions or collections of credit after the March 9, 1992 date of incarceration.

Had the coconspirator Vozzella been arrested by the FBI while in the process of collecting "vig" from an individual who borrowed money from Urrego, and this collection was done at the request of Urrego, and at the time of Vozzella's arrest he was in possession of a firearm, and the remaining *Pinkerton* requirements were met, that scenario would present issues of fact for the jury as to whether the defendant Urrego was still participating in the conspiracy and could reasonably foresee the use of a firearm by his alleged coconspirator Vozzella (*See Agueci, supra,* 310 F.2d at p. 839). That, however, is not the factual picture in this case.

In the present case, there was no evidence that Urrego did any acts in furtherance of the conspiracy after his arrest on March 9, 1992. In fact, the only evidence connecting the defendant Urrego to Vozzella after the arrest was the tape recorded conversation of Urrego with Salvatore DiSalvo, which was introduced by the defendant. In this tape, Urrego and DiSalvo are discussing "the thing" which Vozzella was carrying when he was arrested at Arms Painting and Urrego's remark that Vozzella was "stupid" for having it with him. There was no evidence that this comment was related to the ongoing conspiracy. Further, it is the Government's position that DiSalvo is not even a coconspirator in the crimes charged in the indictment. This is far from evidence which a reasonable juror could use to convict Urrego of vicarious criminal agency liability for the firearm charge under a *Pinkerton* theory.

In this case, the only evidence to tie the gun to the extortion conspiracies is the fact that the gun was found in the same "fanny pack" as some alleged extortion records. There was no evidence that Vozzella ever used a gun, or threatened the use of a gun, in connection with the alleged extortion conspiracy. When examining this "paper thin" evidence in conjunction with the fact that Vozzella was arrested with the gun two days

after the incarceration of the defendant Urrego, the Court finds that this situation goes beyond the outer edge of *Pinkerton* liability. It appears to the Court that based on the evidence presented to this jury, a verdict of guilty on this charge would be based on sheer speculation or surmise.

Finally, in addressing the argument by the Government that the *Pinkerton* firearm charge was given to the jury in the case of *United States v. Masotto,* CR 92–1341 (TCP), the Court notes that the indictment in that case was very different from the present case. In *Masotto,* the two firearms counts were related to two robberies, the robbery of All Pro Delivery Service on July 23, 1991 and the robbery of Harold Levinson and Associates on October 21, 1991. The two robberies, at which time the coconspirators possessed firearms, were charged as substantive counts as well as part of the racketeering conspiracy charged in the indictment. This conspiracy allegedly spanned a period of time from December 1990 until December 1992. In *Masotto,* unlike the present case, the defendant Masotto was not in custody at the time of either robbery and the conspiracy was not alleged to terminate prior to the time of either robbery.

### CONCLUSION

Based on the foregoing, in this Court's view, a *Pinkerton* jury instruction as a threshold for the firearm count charged in this indictment would improperly extend the reach of *Pinkerton* beyond that contemplated by the Supreme Court and the Second Circuit. Accordingly, since the Court has determined that there is no basis for a reasonable jury to convict on count three of the second superseding indictment, the motion pursuant to Fed.R.Crim.P. 29 to dismiss that count is granted.

The decision of the Court shall consist of the oral decision read into the record on April 27, 1994, together with this written decision.

**SO ORDERED.**